IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                          No. CR 14-0123 RB

SANTOS JOSEPH ROMERO-RODARTE,

    Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Evidence and Statements, filed January 23, 2014. (Doc. 18). Having carefully considered the submissions of counsel and the evidence adduced at the March 31, 2014 hearing, and being otherwise fully advised, the Court **DENIES** Defendant's motion.

#### FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the testimony from Customs and Border Protection Special Response Team Officer Oscar Rodriguez, Customs and Border Protection Officer Saul Alba, and Defendant Santos Joseph Romero-Rodarte.

1. Officer Oscar Rodriguez has been with Customs and Border Protection (CBP) for nine years. He is now a member of the special response team. As a CBP officer he has been assigned to the various ports of entry within the El Paso Sector, inspecting both incoming

and outgoing traffic. During the span of his career he has conducted thousands of outbound inspections. (Tr. at 6:9-8:10).[1]

2. On October 14, 2013, Officer Rodriguez was on duty at the Santa Teresa Port of Entry. (Tr. at 8:11-16).

3. The Santa Teresa Port of Entry is located in or near Santa Teresa, New Mexico on the Pete Domenici Highway. The Santa Teresa Port of Entry is located at the United States' border with Mexico. (Tr. at 9:17; 31:19-32:3).[2]

4. At 11:20 a.m. Officer Rodriguez encountered the Defendant, who was driving a dark gray Chevrolet. Defendant was stopped at the Santa Teresa Port of Entry while travelling southbound on the Pete Domenici Highway. The stop occurred while the Defendant was travelling in the outbound inspection lane, at the same location where the black truck is pictured in Exhibit 5.[3] Defendant was driving the vehicle. There was a female on the passenger side of the vehicle, who was determined to be the Defendant's mother. (Tr. at 18:6-19:13; Ex. S5).

5. When Officer Rodriguez encountered the Defendant, he gave him a General Declaration for Customs, which is a standard set of questions for people entering or exiting the United States. Officer Rodriguez asked the Defendant if he was carrying weapons, ammunitions, or monetary instruments in excess of $10,000. The Defendant answered in the negative – he was not carrying any of the aforementioned items. (Tr. at 19:14-20:9).

6. Officer Rodriguez then asked the Defendant and his mother for identification or immigration documents, which Officer Rodriguez was authorized to do. Defendant's

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version taken on March 31, 2014. Any finalized transcripts may contain slightly different page and/or line numbers.
[2] Exhibits S1-S7 show the Santa Teresa Port of Entry, focusing on the outbound inspection lane.
[3] The Government marked the location of the stop with red arrows. The top arrow points to the location Defendant was stopped. (See Ex. S5; Tr. At 15:17-23).

mother produced a passport. Defendant produced a California identification card. (Tr. at 20:10-16; Ex. S8).

7. Defendant's California identification card was not sufficient to establish Defendant's citizenship. (Tr. at 21:7-22:7).

8. Officer Rodriguez then asked Defendant where he was born. The Defendant stated that he was born in Fresno, California.[4] Officer Rodriguez then asked the Defendant about his final destination. The Defendant responded that he was travelling to Zacatecas, Mexico, where he would be joining his wife. (Tr. at 22:10-24).

9. As Officer Rodriguez could not conclusively determine Defendant's citizenship, Officer Rodriguez proceeded to do further investigation into Defendant's citizenship. Officer Rodriguez asked Defendant to move over to the side of the outbound inspection area while his citizenship or his valid documentation was confirmed. (Tr. at 22:11-23:1).

10. While another officer stayed with the Defendant, Officer Rodriguez kept Defendant's California identification card and went into passport control secondary to verify Defendant's citizenship and perform a criminal history check. The California identification card provided sufficient information to conduct the criminal history check. (Tr. at 23:1-17).

11. Another officer, Officer Parra, who was responsible for performing these inquiries, performed the query on the Defendant's criminal history. As a result, Officer Parra discovered that the Defendant had a criminal history, which included being previously removed from the United States. (Tr. at 23:23-24:11).

---

[4] Defendant disputes this fact, claiming he was asked where he was coming from, not where he was born. The Court, having observed the testimony, finds Officer Rodriguez more credible than the Defendant and resolves this dispute in favor of Officer Rodriguez's testimony.

12. After learning that the Defendant had a criminal history, which included being removed from the United States, Officer Rodriguez asked Officer Saul Alba to bring the Defendant inside to passport control secondary to further investigate Defendant's citizenship status. At that point, while Officer Rodriguez had significant evidence that the Defendant was not in the United States legally, Defendant was not under arrest. (Tr. at 24:21-25:14).

13. Once CBP Officer Saul Alba received the call to bring Defendant to passport control secondary, he placed the Defendant in handcuffs. Agent Alba then brought the Defendant into passport control secondary and placed him in a holding cell where he conducted a pat-down. These precautions were routine procedure taken for the purpose of officer safety. At this point, Defendant was detained. (Tr. at 25:18-23; 41:22-25; 53:22-54:9).

14. As the Defendant was in the holding cell, Officer Rodriguez, while holding the results of the preliminary criminal history check in his hand, informed the Defendant that his criminal background check returned positive, and showed that he had been previously deported.[5] (25:23-25).

15. After being informed of this criminal history, the Defendant admitted to having been previously deported. Specifically, Defendant stated something to the effect of, "I have been deported before. I just want to return to Mexico, which is why I got my things in the truck." (Tr. at 26:1-9; 28:24-29:1).

16. After the Defendant's voluntary admission, Officer Rodriguez considered the Defendant to be under arrest. (Tr. at 28:24-29:1; 44:6-7).

---

[5] Officer Rodriguez admitted that he does not remember the exact words he used when telling the Defendant about the results of the criminal history check. Based on the testimony, it is clear to the Court that Officer Rodriguez did not ask a question, but only made a statement regarding the results of the criminal history check. (Tr. at 43:24-45:19).

17. The Defendant was then kept in the holding cell. During this time, the Defendant asked Officer Rodriguez on several occasions what was going to happen to him, and wanted to get a sense of his options. Officer Rodriguez responded by telling the Defendant the prosecution officer, or the enforcement officer, would be responsible for determining his fate. Officer Rodriguez further informed him that he was not free to leave. (Tr. at 26:19-27:5).

18. At no point in Officer Rodriguez's interaction with the Defendant was Defendant read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant was given *Miranda* warnings by a different officer at 12:24 p.m. At that point, he requested an attorney. (Tr. at 45:20-45)

19. Sometime later, Defendant's fingerprints were scanned through the relevant databases and returned a positive response indicating that he had been removed six times from the United States, thus confirming the initial criminal history check. (Tr. at 49:9-16).

20. Ultimately, Defendant was charged with re-entry of a removed alien, in violation of 8 U.S.C. §§ 1326(a) and (b).

### LEGAL STANDARDS AND CONCLUSIONS OF LAW

Defendant moves to suppress all physical evidence and statements obtained as a result of the seizure on October 14, 2013, including his fingerprints and alien file ("A-file"). (Doc. 18). In support of the motion, Defendant contends: (1) his search at the border checkpoint was not supported by probable cause or reasonable suspicion; and (2) he was subjected to custodial interrogation before being advised of his *Miranda* rights. The United States responds that the officers did not require reasonable suspicion or probable cause to conduct a search at the border,

and that the questioning by Officer Rodriguez amounted to a routine border inspection that did not require the giving of *Miranda* warnings. (Doc. 22).

**I.      The Border Search Exception**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. Searches or seizures which are not authorized by the judicial process are "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

Among these well-established exceptions to the Fourth Amendment's warrant based on probable cause requirement is the border search exception. *See Carroll v. United States*, 267 U.S. 132, 154 (1925). This exception is far reaching. Under this doctrine, a governmental officer at the international border may conduct routine stops and searches without a warrant or probable cause because the United States as a sovereign state has the right to control what persons or property crosses its international borders. *See United States v. Ramsey*, 431 U.S. 606, 616 (1977); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) (stating that at the border "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause or warrant.") Detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause. *United States v. Massie*, 65 F.3d 843, 848 (10th Cir. 1995)

In this case, Defendant was stopped and questioned at the Santa Teresa Port of Entry, a fixed border crossing. Until the Defendant was officially detained,[6] the search and seizure of the Defendant were indisputably routine. The officer merely asked questions about possession of

---

[6] The Court considers the Defendant to have been officially detained once he was escorted to passport control secondary. At that time, the officer had probable cause to arrest the Defendant, so the Court need not consider whether the border search exception would have justified the continued seizure of the Defendant.

6

specifically prohibited items, the Defendant's immigration status, and for proof of citizenship. This kind of interaction with a person crossing an international border is well within the government's power to control the persons and property crossing the international border. *See Ramsey*, 431 U.S. at 616. Thus, the border search exception is clearly implicated, and pursuant to this exception, the border stop was lawful.

The Defendant argues that the border search exception does not have the same force when applied to outgoing searches. This Court disagrees. While the Tenth Circuit has not specifically considered this question, this issue has come up before many of our sister circuits. The result has been unanimous: the border search exception applies to outgoing searches. *See United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir. 1980); *United States v. Ezeiruaku*, 936 F.2d 136, 143 (3d Cir. 1991); *United States v. Oriakhi*, 57 F.3d 1290, 1296-97 (4th Cir. 1995); *United States v. Odutayo*, 406 F.3d 386, 391 (5th Cir. 2005); *United States v. Boumelhem*, 339 F.3d 414, 420-23 (6th Cir. 2003); *United States v. Udofot*, 711 F.2d 831, 838-40 (8th Cir. 1983); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982). Accordingly, this Court is confident the Tenth Circuit would follow the rulings of all the other circuits that have considered this question.

In sum, the Court has no reason to depart from the well-established law concerning the border search exception. Under this exception, it is absolutely clear that "[d]uring a routine fixed-checkpoint stop, border patrol agents may question individuals in the absence of individualized suspicion about their citizenship and immigration status and request documentation." *Massie*, 65 F.3d at 847-48. Beyond this initial routine questioning, no further, more intrusive action was taken in the absence of probable cause.[7] Accordingly, Defendant's Fourth Amendment rights were not violated.

## II.     Defendant Was Not Interrogated for Purposes of *Miranda*.

---

[7] Probable cause was established when the Defendant's criminal background check came back positive.

Next, Defendant argues that his Fifth Amendment Rights were violated when the officers failed to timely advise him of his *Miranda* rights. The Court disagrees. The Defendant was not interrogated for the purposes of *Miranda*.[8]

Pursuant to the Fifth Amendment, all persons have a privilege against self-incrimination. U.S. CONST. amend. V. To give practical effect to this constitutional guarantee, the Supreme Court requires that law enforcement advise persons in custody of the privilege prior to interrogation. *See Miranda,* 384 U.S. at 479. Statements taken during a custodial interrogation cannot be admitted at trial to establish the guilt of the accused unless the government has provided the accused with a full and effective warning of his rights at the outset of the interrogation process, and the accused has voluntarily, knowingly, and intelligently waived his rights. *Id.* at 444-45. Thus, the advisement of rights is constitutionally required only when a person is in custody and subject to interrogation. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

The Supreme Court has given courts significant guidance in determining whether a suspect was in custody for the purpose of *Miranda*, stating:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

---

[8] The Court only considers whether Defendant's *Miranda* rights were violated when he was placed in a holding cell at passport control secondary. *Miranda* is not implicated during routine stops at a fixed border checkpoint. *See United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000) ("we conclude that a routine stop at a fixed border checkpoint . . . is not custodial and *Miranda* warnings are not necessary.") Thus, there is no argument that Defendant's rights under *Miranda* were violated prior to him being detained.

8

*Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (internal citations and quotations omitted).

Considering these factors, the Court determines that the Defendant was in custody while at passport control secondary. The Defendant was no longer in the realm of a routine border checkpoint stop. The Defendant was in handcuffs, had been patted down, and was confined to a holding cell. It was clear to both the Defendant and Officer Rodriguez that he was unable to leave. The Defendant was held in custody after the conclusion of the questioning. Thus, given these circumstances, no reasonable person would have felt he or she was at liberty to terminate the interrogation and leave.

The second factor – whether the Defendant was subjected to interrogation – is a closer question. However, considering the circumstances, it is clear that when Officer Rodriguez informed the Defendant that his criminal background check had returned positive and that he had been deported, he was merely making a statement. This statement was made to inform the Defendant of what was happening, and was not a question for the purposes of *Miranda*.

Interrogation results when there are "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Thus, interrogation includes both express and implied questioning, so long as the officer's words or actions are reasonably likely to elicit an incriminating response. *See United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004).

Here, Officer Rodriguez did not, and was not, interrogating the Defendant. The Defendant was not being questioned when he offered his admission. Rather, Officer Rodriguez merely informed the Defendant of the reason he was being detained, and the Defendant's

9

admission was nothing more than a voluntary confirmation of the facts Officer Rodriguez knew to be true.

The Tenth Circuit has offered some guidance on the statement versus interrogation dichotomy. Specifically, *United States v. Rambo* is instructive. 365 F.3d at 909. In *Rambo*, the defendant was arrested on charges of aggravated robbery. *Id.* at 907. One of the officers explained to the defendant the charges that he and his co-defendant were facing and then asked the defendant, "[D]o you want to talk to me about this stuff?" *Id.* at 908. The defendant responded, "No." *Id.* The officer then continued to talk to the defendant about what was going to happen next and then reminded the defendant of his *Miranda* rights. *Id.* The defendant waived those rights and gave a complete confession to the police. *Id.* at 909. The Tenth Circuit held that the officer's initial, pre-*Miranda*, questions were reasonably likely to produce incriminating information, and that, therefore, Rambo was under interrogation. *Id.* at 910.

Unlike *Rambo*, Officer Rodriguez's statement was not made in an effort to gain information from the Defendant. In *Rambo*, the Defendant's statements were made in the context of a videotaped interview with the defendant, where officers made four separate invitations to get the defendant to speak. *See id.* Further, in *Rambo* the officer's statements clearly invited the defendant to take or deny responsibility for his actions. The Tenth Circuit identified this type of police activity as positing the guilt of the subject, which is a form of questioning the Supreme Court recognized in *Innis*. *See id.* at 909 (citing *Innis*, 446 U.S. at 299)

Here, Officer Rodriguez made a single statement to the Defendant about his criminal history. The statement was not made in the context of a formal interview. And, the statement was made in such a fashion that it did not require an answer. Contrary to *Rambo*, Officer Rodriguez

was not positing the guilt of the Defendant. Instead, Officer Rodriguez was informing the Defendant of what the officers found during their background check.

Importantly, the Tenth Circuit has held that these distinctions are material. In *United States v. Nelson*, the Tenth Circuit again considered whether a conversation between an officer and a defendant constituted a *Miranda* violation. *See* 450 F.3d 1201, 1211 (10th Cir. 2006). In *Nelson*, the defendant was being held pending transfer to the local jail. Before acknowledging his *Miranda* warnings, the defendant asked the officer what the police had found during a search of his apartment. After the officer informed the suspect that officers found incriminating evidence, the suspect stated, "I guess I'm ready to go to jail then." *Id.* at 1210. The *Nelson* Court found that *Miranda* was not implicated because, unlike *Rambo*, the officer did not repeatedly make statements positing the defendant's guilt, and was only answering a question posed by the defendant. *Id.* at 1211.

Even though the Defendant did not specifically ask for information from Officer Rodriguez, this case is analogous. In both cases, the officer provided relevant factual information, which was not presented in the form of a question, and the defendants voluntarily responded with an admission. Further, in both cases, the officer did not press the defendants for an answer, or make any leading comments about their supposed guilt.

Calling these types of informative statements from officers a *Miranda* violation would lead to an unnecessary result, where officers would be unable to notify suspects of the rationale for their detention, or provide any information whatsoever, for fear a suspect's voluntary confession would be suppressed. Such a rule would do nothing to promote the purpose of *Miranda* – to prevent officers from using the interrogation environment to undermine the privilege against compulsory self-incrimination. *Innis*, 446 at 299. Nor, would it help defendants.

In short, this case involves no coercion. There is no indication or suggestion that Officer Rodriguez put any undue pressure on the Defendant to confess to his crimes. Looking at Officer Rodriguez's statement objectively, the Court finds it was unlikely to elicit an incriminating response. Therefore, *Miranda* is not implicated.

**III.    The Exclusionary Rule Only Applies to Defendant's Statement About His Criminal History**

Because this issue was brought up at the evidentiary hearing, and may be relevant in Defendant's plea negotiations, the Court also briefly considers what evidence would be suppressed in the event of a *Miranda* violation. After a brief overview of Tenth Circuit law, it is clear that only Defendant's statement, not any physical evidence, would be suppressed as the result of a *Miranda* violation.

In *United States v. Patane*, 542 U.S. 630 (2004) (plurality), the Supreme Court concluded the exclusionary rule or "fruit of the poisonous tree doctrine" does not apply "to mere failures to give *Miranda* warnings[.]" *Id.* at 643. Relying on *Patane,* the Tenth Circuit subsequently held in *United States v. Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006), that physical evidence obtained as a fruit of a defendant's voluntary, *i.e.* uncoerced, statement to a police officer is admissible at trial "regardless of whether the officer gave the defendant *Miranda* warnings."

Accordingly, only the statement made in violation of a defendant's Fifth Amendment right would be suppressed. All other physical evidence obtained by the government in its investigation, including a defendant's fingerprints and immigration file, would remain admissible. *See United States v. Lara-Garcia*, 478 F.3d 1231, 1235-36 (10th Cir. 2007) ("Even *assuming* the district court was correct in holding the agent's question violated Defendant's Fifth Amendment right, the physical evidence which arose from such violation, *i.e.,* Defendant's fingerprints and immigration file, is not suppressible.")

**THEREFORE,**

**IT IS ORDERED** that Defendant Santos Joseph Romero-Rodarte's Motion to Suppress (Doc. 18) is **DENIED**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**